FILED
2005 Sep-20 PM 02:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SAMUEL MOORE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 02-PWG-2692-S |
| ) | |
| ITT TECHNICAL INSTITUTE, ) | |
| ) | |
| Defendant. ) | |
| | |
| STEPHEN HOBBS, BARRY JEFFERSON, ) | |
| WEENA JONES, KIMBERLY McTYER, ) | |
| CARRIE MOORE AND CHELAVONNE ) | |
| SINGLETON, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 03-PWG-0708-S |
| ) | |
| ITT TECHNICAL INSTITUTE, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OF OPINION

Plaintiff Barry Jefferson, an African American male, filed this action against the defendant, ITT Technical Institute, alleging race discrimination in employment in violation of Title VII and 42 U.S.C. § 1981. Specifically, he alleges that he was racially discriminated against in training, lead assignments and write-ups and evaluations and being moved from outside to inside representative. He further alleges that he was constructively discharged. He seeks injunctive relief, back pay, punitive and compensatory damages, and nominal damages.

The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.

This case is before the court on ITT's Motion for Summary Judgment. (Doc. # 21).

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his *prima facie* entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such

> circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

The following pertinent facts are undisputed or, if disputed, viewed in the light most favorable to Jefferson, the nonmoving party.

ITT is a private college system focused on technology-oriented programs of study operating over 70 ITT Technical Institutes in 28 states. Jefferson began working for ITT as an outside representative, step II, on February 12, 2001. Outside representatives are responsible for recruiting, interviewing, enrolling and starting high school students as ITT students. Jefferson was hired into a higher than entry level position based on his extensive recruiting experience in the U.S. Navy, including an initial three-month recruiting school and continued training throughout his naval recruiting service that kept him abreast of up-to-date sales techniques. Jefferson interviewed with DOR Reeves for the ITT position, and Reeves was Jefferson's supervisor when he began his employment at ITT. Jefferson understood that his performance would be evaluated based on the number of students he actually enrolled as a representative. Kimberly McTyer was also hired as an outside representative effective February 12, 2001.

Jefferson contends that Reeves was responsible for training him but failed to do so. Jefferson and McTyer watched videotapes as part of their training. Jefferson also received a college tour and completed the new hire papers as part of his training. Jefferson contacted the company ombudsman in April of 2001 to complain about his training. The company ombudsman contacted Rice and requested a copy of the Representative Training Agenda for Jefferson and McTyer. The

3

Representative Training Agenda identifies and describes the training that each new representative is expected to receive.

McTyer and Jefferson were the first two representatives that Reeves, the new DOR, was responsible for training. Reeves testified that he did not learn that the Representative Training Agenda was to be completed contemporaneous with the training until he attended DOR training in mid to late April 2001. Reeves completed the Representative Training Agendas when Rice requested the agendas in April 2001 and made what he described as an "honest" and "conscientious" attempt to reconstruct the dates that the training had been conducted.

Jefferson and McTyer observed Litvine do one or two high school presentations in February 2001 as part of their training. Jefferson also observed Reeves conducting interviews after he complained to the ombudsman. In Jefferson's estimation, Reeves was put into a position that he did not handle well.

Jefferson was sent to Jacksonville, Florida with McTyer and Reeves for additional training after Jefferson complained to the ombudsman. Jefferson and McTyer, along with approximately ten representatives from other ITT campuses, received two to three days of training while they were in Jacksonville. Jefferson has no complaints regarding the Jacksonville training other than that the training was compressed into a three-day period.

No other ITT representatives have been sent from ITT's Birmingham campus to another ITT facility for initial training. Jefferson does not know of any other newly-hired representative who received better training than he did.

Jefferson believes that Booth received favorable treatment and that "it was more like Mr. Booth ran the ... department." (Jefferson depo., pp.107-08). Everyone had problems regarding

Booth because they perceived that he was favored with regard to time off and leads. Jefferson also believes that Ruffin favored McTyer over him.

Ruffin told Jefferson that he felt as though Jefferson had betrayed Reeves, Ruffin, ITT, and the Navy when he reported that Reeves was not training him because Ruffin, Reeves, and Jefferson all served in the U.S. Navy. Jefferson believes that Ruffin unfairly assessed, harassed, and retaliated against him because he reported that Reeves was not training him.

Booth is the only white employee Jefferson identifies as receiving more favorable assessments than he did and Jefferson admits that Booth's productivity was greater than his.

Jefferson was moved from the outside representative position to an inside representative position effective November 1, 2001 because ITT's Birmingham campus had four outside representatives but was only budgeted for three whereas a budgeted inside representative position was vacant in October 2001. Inside representatives are responsible for recruiting, enrolling and starting as ITT students potential ITT students who are not high school students. Jefferson took the position that Ruffin had prior to becoming DOR. At the time Jefferson was transferred from the outside to the inside, Steve Litvine was the best-performing outside Representative, and Stephen Hobbs was the second-best performing outside Representative, while both McTyer and Jefferson were "kind of struggling."

Ruffin told Jefferson that he was the junior man meaning that he was the last person hired when Jefferson asked Ruffin about moving into the inside. Although Jefferson and McTyer were employed effective the same date, McTyer received her offer of employment before Jefferson. Jefferson believes that selecting the person with the least seniority is a fair way to make the decision.

Jefferson's complaints about lead assignments relate only to when he was an inside representative "because as an outside representative, you could pretty much produced your own." Jefferson believes that Ruffin assigned him less desirable leads than were assigned to Booth, Carrie Moore and Weena Jones based on the Navy loyalty issue.

Ruffin gave Jefferson a letter of warning and placed him on probation because of lack of production during the last couple of months that Jefferson was a ITT. Jefferson does not recall if he completed the probation. Ruffin also gave Rowlen, a white female, a letter of warning for lack of production. While Jefferson does not recall ever receiving an annual evaluation he received an annual evaluation from Ruffin rating his performance at "4." Jefferson was only evaluated from September 2001 until February 2002, the time that he was supervised by Ruffin.

Jefferson only worked as an inside representative for three or four months. He resigned his ITT employment effective March 27, 2002, to work for High Tech Institute.

*McDonnell Douglas* framework

Because Jefferson attempts to prove his case with circumstantial evidence, the burdenshifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) is applicable. Under this framework, Jefferson has the initial burden of establishing a *prima facie* case of discrimination. *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997), *cert. denied,* 522 U.S. 1045 (1998). If he proves a *prima facie* case of discrimination, the burden shifts to ITT to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for its action; however, "the defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. Defendant's burden is "exceedingly light" *Meeks v. Computer*

*Associates, Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994).  If the defendant carries this burden, the presumption of discrimination created by the *prima facie* case "drops from the case" and "the factual inquiry proceeds to a new level of specificity.  *Burdine*, 450 U.S. at 255, n. 10.  The burden then shifts to the plaintiff to present sufficient evidence, including evidence produced in support of the *prima facie* case "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but were merely pretext for intentional discrimination.  *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, *McDonnell Douglas*, 411 U.S. at 804).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. " *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

To establish a *prima facie* case of discrimination based on disparate treatment, Jefferson must show that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) similarly situated persons outside the protected class were treated more favorably.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Assuming that a *prima facie* case is established, the court then looks to the remainder of the *McDonnell Douglas* framework.

A.   Failure to train

Jefferson alleges that Reeves, white, failed to adequately train McTyer and him, both African American.  After complaining about the training they received from Reeves, they were sent to ITT's Jacksonville, Florida campus for two to three days of additional training.  McTyer and Jefferson were the only representatives hired while Reeves was DOR and therefore the only employees trained by Reeves.  Jefferson does not identify any person who was outside the protected class who was

7

better trained by Reeves. His *prima facie* case fails due to his failure to show that a similarly situated person outside the protected class was treated more favorably.

> The plaintiff and the employee she identifies as a comparator must be similarly situated "in all relevant respects." *Id*. The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer. *See Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).

*Wilson v. B/E Aerospace, Inc.,*, 376 F.3d 1079, 1091 (11th Cir. 2004), quoting from *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994). To be similarly situated the comparator employee would have to be an outside representative trained by Reeves.

    B.    Lead assignments

Jefferson complains about lead assignments while he was an inside representative. He testified that he believed that he was assigned less desirable leads than the other inside representatives based on the fact that Ruffin considered him disloyal to the Navy, Ruffin and Reeves as Jefferson, Ruffin and Reeves were all Navy veterans. The fact that he received less favorable assignments because he was perceived as "disloyal" to the Navy, Ruffin and Reeves is not racial discrimination or otherwise redressable under Title VII.[1]

    C.    Write-ups

Jefferson complains that he received a "write-up" from Ruffin based on lack of production; however, he has not identified anyone outside of the protected class who had similarly poor

---

[1] The other inside representatives were Cary Booth, white; Carrie Moore, African American; Weena Jones, African American, and "Tim," white. Jefferson also believes that Ruffin favored McTyer, an African American, over him. While Jefferson believes that two people outside the protected class were treated more favorably than him when it came to lead assignments, he also believes that three people within the protected class (Moore, Jones, and McTyer) were treated more favorably than him with respect to leads. He testified without equivocation that he believed the lead assignments were based not on race but on the Navy loyalty issue.

production who did not receive a "write-up." Moreover, poor performance was a legitimate non-discriminatory reason for ITT giving him a letter of warning and placing him on probation. As evidence of pretext, he cites to Hobbs's deposition testimony that Ruffin told Hobbs that he had been put up to running McTyer and Jefferson off. Hobbs testified that after leaving ITT, he stopped by one day:

> And he [Ruffin] apologized to me for some of the things that transpired there, and told me that he was made to do some of the things that happened there.
>
> Q.  That he was directed to do those things by his supervisor?
>
> A.  That's correct.
>
> Q.  And what things were those?
>
> A.  Well, just make things just, you know, basically hard, you know, for us. Meet compliance with, I guess, the regulations there. Just having some of the things that went on, as far as the job was concerned, and things of that nature.
>
> Q.  Mr. Ruffin didn't tell you that he was told to do that because you were black; correct?
>
> A.  Not to my knowledge.
>
>     ....
>
> A.  Like I said, I was in the neighborhood that particular evening I decided to stop by. And that's when Mr. Ruffin came and told me that. ... [H]e apologized to me for what went on after I left, and that he was wrong, and that that was the reason – that's why he did it, because he was instructed to do so.
>
> That he tried to make it hard for Barry and Kimberly to get fired, and just hope I would leave.

(Hobbs depo., 310-14).

Ruffin testified that Rice did not tell him that he wanted him to watch any certain employees more closely than others but that Rice did question him about employees whose production was low, ie. Hobbs, McTyer and Jefferson.   (Ruffin depo., 73).

Ruffin testified:

Q. Did you ever tell any of the Plaintiffs in this lawsuit that Mr. Rice had – had put you up to taking any actions against them at ITT because of their filing their – this lawsuit or complaining about discrimination or any – or filing their EEOC charges?

A. Yes, I did.  After I was terminated?  Yes, I did because everything came to light.

....

Q. What did you say?

A. I was saying, you know, they used me to get rid of Stephen Hobbs and Barry Jefferson, who was the major complainers.  And now that they're done with them, now he's done with me.  That's just how I felt.

Q. How do you feel they used you to get rid of Mr. Hobbs and Mr. Jefferson?

A. Because again they felt it was a racial – they felt it's a racial problem that they had at the school, and this is starting back before I even came to ITT Tech.  And they said that – that Mr. – they felt that Mr. Rice was using me to ease the problem down on the earlier incident we was talking about with Benny Reeves and get the heat off of him.

....

Q. Did anyone ever tell you to treat Barry Jefferson differently because of his race?

A. No, sir.

Q. Did anyone ever tell you to treat Barry Jefferson differently because he might have complained about race discrimination?

A. No, sir.

Q. Did anyone ever tell you to treat Stephen Hobbs differently because of his race?

10

> A. No, sir.
>
> Q. And did anyone ever tell you to treat Mr. Hobbs differently because he'd complained about race discrimination?
>
> A. No, sir.
>
> Q. Did anyone ever tell you to treat Kimberly McTyer differently because of her race?
>
> A. No, sir.
>
> Q. Did anyone ever tell you to treat Ms. McTyer differently because she'd complained about race discrimination?
>
> A. No, sir.
>
> Q. Or ever tell you to keep a paper trail on any of your employees?
>
> A. No, sir. But as the – the way the system works, you have to let the employee know where he or she stands, especially with production. So if there's a lack of production, you have to formally let them know hey, this is where you're at now; this is where you need to be; and that starts with the letter of caution. Then the letter of warning, then the letter of perf – of probation.
>
> ....
>
> Q. Did anyone ever tell you take action against any of the – any of the Plaintiffs because they complained of race discrimination?
>
> A. No, sir.
>
> ....
>
> Q. And – so do you believe that Mr. Rice put you up to taking some action against any of these Plaintiffs because they complained about race discrimination?
>
> A. No.

(Ruffin depo, 84-85, 120-21, 128-29).

11

Despite what he may have told the plaintiffs based on his feelings following his termination, Ruffin's testimony clearly does not indicate that Rice encouraged Ruffin to run off Hobbs, McTyer or Jefferson and, therefore, is not evidence of pretext.

D.  Evaluation

Jefferson argues in his brief that "the bad evaluations were a result of the leads being taken away and the write-ups also contributed to the bad evaluations." The court has determined that the underlying leads and write ups claims are without merit.

In his deposition, Jefferson did not recall receiving an annual evaluation. Ruffin did, however, evaluate Jefferson's performance from September 2001 until February 2002, the time that he was supervised by Ruffin. Ruffin gave him a "4" rating which allowed him to receive a raise. Jefferson identified Cary Booth, white, as receiving more favorable assessments from Ruffin than Jefferson did; however, Jefferson admitted that Booth's productivity was greater than his. Based on this admission that Booth's productivity was greater, Jefferson cannot establish that a similarly situated employee outside Jefferson's protected class was treated more favorably.

E.  Moving from outside representative to inside representative

Jefferson was moved from the outside representative position to an inside representative position effective November 1, 2001. The move resulted in a $2,000 decrease in salary. He argues that this move was the result of both racial discrimination and retaliation.

Jefferson cannot show disparate treatment because he cannot show he was treated differently than a similarly situated employee outside of the protected class. When he was moved from outside to inside, there were four outside representatives. The only outside representative who was outside of Jefferson's protected class was Steve Litvine, but Litvine was the best performing outside

representative while Jefferson was "struggling," therefore, Litvine would not be an appropriate comparator.

Jefferson argues that he can establish a *prima facie* case of retaliation. To establish a *prima facie* case for retaliation, Jefferson must show that "(1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between his protected activity and the adverse employment action." *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir. 2001).

He argues that he was moved from outside to inside representative almost immediately after complaining to Marty Baca about race discrimination. Assuming that Jefferson's complaint was a protected activity and that there was a causal link between the protected activity and the adverse action, ITT argues that it had a legitimate reason for moving Jefferson from outside to inside representative. Specifically, ITT asserts that he was moved to an inside position because the Birmingham campus was only budgeted for three outside representatives and that there was an inside position budgeted and vacant in October 2001. Jefferson was selected instead of McTyer because Jefferson had less seniority. Although the effective date of employment for both Jefferson and McTyer was the same, she was offered a position first. Jefferson conceded that seniority was a fair way to make such a decision.

As pretext, Jefferson relies upon the same evidence relied upon as pretext for the write-ups (Hobb's deposition testimony) which the court has concluded is insufficient.

II.   Constructive Discharge claim

"A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have

been compelled to resign.'" *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003).

In his deposition testimony, Jefferson specifically testified that he left ITT for a better career opportunity and that he was not making a claim about the termination of his ITT employment. (Jeffferson depo, p. 208-09). The constructive discharge claim therefore fails.

Based on the foregoing, ITT's Motion for Summary Judgment (doc. #21) is due to be granted. A separate final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 20th day of September, 2005.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE